## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 0:13-cv-62496-LENARD/GOODMAN

**ADELE FERRERA, DANA COOKE, GABRIEL IBERTIS, , RAHSAAN ASHFORD, and ANNE STEIMLE,** individually and on behalf of all others similarly situated,

       *Plaintiffs*,

vs.

**SNYDER'S-LANCE, INC.,** a North Carolina corporation,

       *Defendant*.

## SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Adele Ferrera, Dana Cooke, Rahsaan Ashford, and Anne Steimle, (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, hereby bring this Second Amended Class Action Complaint against Snyder's-Lance, Inc. ("Snyder's" or "Defendant"), and allege as follows. The allegations in this Second Amended Complaint are based on the personal knowledge of each of the Plaintiffs as to themselves and on information and belief as to all other matters, through investigation of Plaintiffs' undersigned counsel. Plaintiffs believe substantial evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiffs allege, on behalf of themselves and all others similarly situated (the "Class" or "Classes," as defined below) that from November 13, 2007, through the present, Defendant unlawfully, deceptively, misleadingly, unfairly, and negligently marketed, and continues to deceptively and misleadingly market, certain products as "All Natural," "natural," and/or "naturals" when, in fact, those products contained unnatural genetically-modified organisms ("GMOs")[1] and, in many cases, other unnatural artificial and synthetic ingredients.

———————————————

1.      As used herein, "genetically-modified" refers to the use of molecular biology techniques, such as recombinant DNA techniques, to delete genes or to transfer genes for particular qualities from one species to another. In contrast to conventional breeding techniques, modern molecular biology techniques permit the insertion into an organism of genetic material from an unrelated species, as the DNA of a fish into a tomato. *See* Ed Wallis, *Fish Genes into Tomatoes: How the World Regulates Genetically Modified Foods*, 80 N.D. L. Rev. 421 (2004).

2.   The deceptively and misleadingly marketed products include:[2]

- The following products, which this Second Amended Complaint refers to, collectively, as "Snyder's Snacks" and all of which Defendant prominently labels "All Natural":

  o   Snyder's of Hanover The Pounder Olde Tyme Pretzels;
  o   Snyder's of Hanover The Pounder Thins Pretzels;
  o   Snyder's of Hanover Reduced Fat The Pounder Yellow Corn Tortilla Chips;
  o   Snyder's of Hanover Reduced Fat The Pounder Whole Grain Tortilla Chips;
  o   Snyder's of Hanover The Pounder Sticks Pretzels;
  o   Snyder's of Hanover The Pounder Sourdough Dark Specials;

- The following products, which this Second Amended Complaint refers to, collectively, as "Cape Cod Chips" and all of which Defendant prominently labels "All Natural":

  o   Cape Cod Kettle Cooked Potato Chips Original;
  o   Cape Cod Kettle Cooked Potato Chips Sour Cream & Green Onion;
  o   Cape Cod Kettle Cooked Potato Chips 40% Reduced Fat Original; and
  o   Cape Cod Kettle Cooked Potato Chips Sweet Mesquite Barbeque
  o   Cape Cod Kettle Cooked Potato Chips Sea Salt & Vinegar;

This Second Amended Complaint refers to the Snyder's Snacks and Cape Cod Chips, collectively, as the "Product" or "Products."   Attached hereto as **Exhibit 1** and incorporated herein are images of the Product labels, ingredients, and Nutrition Facts.

3.   Throughout the period from November 13, 2007, through the present, Defendant has systematically marketed and advertised the Products as "All Natural," "natural," and/or "naturals" on each package of the Products, such that any United States consumer who purchased the Products, or who purchases the Products today or in the future, is exposed to

---

2.   Defendant may discontinue offering some products and regularly introduces new products that are also falsely and misleadingly labeled "All Natural," "natural," or "naturals." Defendant may also market and sell additional substantially similar products of which Plaintiffs are unaware.  Plaintiffs will ascertain the identity of these additional products through discovery.

3

Defendant's "All Natural," "natural," and/or "naturals" claims.

4.     These claims are deceptive and misleading because the Products are not "All Natural," "natural," or "naturals."

5.     Specifically, all of the Products contain unnatural, genetically-modified ingredients, and many of the Products also contain unnatural artificial, synthetic, and highly processed ingredients, as follows:

- Snyder's Snacks contain either genetically-modified canola oil or genetically-modified corn.[3]  The canola oil is also a synthetic ingredient.  In addition, of the Snyder's Snacks:

  o Two (2) contain corn (*i.e.*, either yellow corn or white corn) enriched with thiamine, riboflavin, niacin (synthetic), iron, and folic acid (synthetic);
  o Four (4) contain enriched flour, which consists of wheat flour, niacin (synthetic), reduced iron, thiamine mononitrate (synthetic), riboflavin, and folic acid (synthetic);
  o One (1) contains dextrose, which is synthetically produced using genetically-modified corn; and
  o One (1) contains corn starch, which contains, or is derived from, genetically-modified corn.

- Cape Cod Chips contain genetically-modified canola oil.  The canola oil is also a synthetic ingredient.  In addition, of the Cape Cod Chips Products:

  o Two (2) contain dextrose, which is synthetically produced using genetically-modified corn;
  o Two (2) contain maltodextrin, which is synthetic; and
  o One (1) contains artificial colors (oleoresin paprika and caramel color)

Attached hereto as **Exhibit 2** and incorporated herein is a spreadsheet showing the ingredients of each of the Products.

---

3.     Two (2) of the Snyder's Snacks also contain "vegetable oil (contains one or more of the following: canola oil, corn oil, sunflower oil)," which may also contain genetically-modified canola oil and genetically-modified corn oil.

6.      GMOs are organisms in which the genetic material (*i.e.*, DNA) has been altered in a way that does not occur naturally, allowing the organism to exhibit traits that would not appear in nature.  "For example, by transferring specific genetic material from a bacterium to a plant, scientists can create plants that can produce pesticidal proteins or other chemicals that the plant could not previously produce.  Using this technology, scientists have modified corn, cotton, and potatoes to produce a pesticidal protein that is toxic when ingested by specific insect pests."[4]

7.      Thus, Defendant misleads and deceives reasonable consumers, including the named Plaintiffs and the other members of the Classes, by portraying Products containing non-natural, genetically-modified ingredients and other non-natural artificial and synthetic ingredients as "All Natural," "natural," and/or "naturals."

8.      Defendant's conduct harms consumers by inducing them to purchase and consume Products containing non-natural genetically-modified ingredients and other non-natural artificial and synthetic ingredients on the false premise that the products are "All Natural," "natural," and/or "naturals" and by inducing consumers to pay a premium price for the Products.

9.      As a result, Plaintiffs bring this class action to secure, among other things, damages and equitable relief, declaratory relief, restitution, and in the alternative to damages, relief for unjust enrichment, for Classes of similarly situated purchasers. Plaintiffs seek damages individually and on behalf of the Class.  In addition, Plaintiffs seek an Order declaring Defendant's business practice to be in violation of consumer protection statutes, and requiring

---

4.      EPA's Regulation of Biotechnology for Use in Pest Management | Pesticides | US EPA, http://www.epa.gov/oppbppd1/biopesticides/reg_of_biotech/eparegofbiotech.htm.

Defendant to cease from representing that the Products are "All Natural" and/or "Natural," so long as the Products continue to contain unnatural, synthetic, and/or artificial ingredients

## JURISDICTION AND VENUE

10.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act of 2005, Pub. L. 109-2, 119 Stat. 4 (Feb. 18, 2005), under 28 U.S.C. § 1332(d), which explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from the State of citizenship of any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.  Plaintiffs allege there are at least 100 members in the proposed Classes, the total claims of the proposed Class members are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, and a member of each of the proposed Classes is a citizen of a State different from the State of citizenship of Defendant (North Carolina).

11.    This Court has personal jurisdiction over Defendant for reasons including but not limited to the following: the claims of Plaintiffs Ferrera, and Cooke arise out of Defendant's conduct within the State of Florida.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to the claims of Plaintiffs Ferrera andCooke occurred in this District, including Defendant's dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products.

## PARTIES

### Plaintiff Adele Ferrera

13.     Plaintiff Adele Ferrera is a consumer residing in Boynton Beach, Florida, which is in Palm Beach County.

14.     From 2010 to 2013, Ms. Ferrera purchased the following Products for her personal consumption:

- Snyder's of Hanover The Pounder Olde Tyme Pretzels;
- Snyder's of Hanover The Pounder Thins Pretzels;
- Snyder's of Hanover The Pounder Sourdough Dark Specials;
- Snyder's of Hanover Reduced Fat The Pounder Yellow Corn Tortilla Chips;
- Snyder's of Hanover Reduced Fat The Pounder Whole Grain Tortilla Chips;
- Cape Cod Kettle Cooked Potato Chips Original;
- Cape Cod Kettle Cooked Potato Chips Sea Salt & Vinegar; and
- Cape Cod Kettle Cooked Potato Chips 40% Reduced Fat Original

at a Target Supercenter in Boynton Beach, Florida, approximately six (6) times per year.

15.     The packaging of the Products Ms. Ferrera purchased contained the representation that they were "All Natural."

16.     Ms. Ferrera believed Defendant's representation that the Products were "All Natural." She relied on the "All Natural" representation in making her purchase decisions and would not have purchased the Products had she known they were not, in fact, "All Natural" because they contained GMOs and other artificial and synthetic ingredients.

17.     Ms. Ferrera paid for "All Natural" Products, but she received Products that were not "All Natural." Specifically, she received Products made from canola oil that was genetically manipulated in a laboratory to exhibit traits canola oil does not possess in nature. Further, she received Products containing enriched flour, which is not natural because it is highly processed (as described below) and because it includes niacin (synthetic), thiamine mononitrate (synthetic),

7

and folic acid (synthetic). Further, the Products she purchased were otherwise synthetic as described herein (*e.g.*, because the particular Products contain maltodextrin).

18. The Products Ms. Ferrera received were unlawfully misbranded, worth less than the Products for which she paid, and rendered valueless. Ms. Ferrera was injured in fact and lost money as a result of Defendant's improper conduct.

19. Ms. Ferrera is still interested in purchasing the Products and intends to purchase the Products in the future based upon the assumption that Defendant will have removed the non-natural ingredients in response to this litigation; certain state law prohibiting the labeling of products as natural that contain GMOs; and, the fact that one of Defendant's major competitors that characterizes its competing products as natural has removed GMOs from its products as a result of litigation. However, if she purchases the Products again in their presently labeled and formulated condition, there is a possibility that she will reencounter and repurchase a Product that is not what it is represented to be in that the Products still contain GMOs. If that is the case, then Plaintiff will have purchased a "noncompliant" misleadingly labeled Product.

**Plaintiff Dana Cooke**

20. Plaintiff Dana Cooke is a consumer residing in Palm Beach County, Florida.

21. In June 2013, Ms. Cooke purchased the following Products for her personal consumption:

- Cape Cod Kettle Cooked Potato Chips Original;
- Cape Cod Kettle Cooked Potato Chips Sour Cream & Green Onion; and
- Cape Cod Kettle Cooked Potato Chips Sweet Mesquite Barbeque

from Publix Super Markets in Palm Beach Gardens, Florida.

22. The packaging of the Products Ms. Cooke purchased contained the representation that they were "All Natural."

23.     Ms. Cooke believed Defendant's representation that the Products were "All Natural."  She relied on the "All Natural" representation in making her purchase decisions and would not have purchased the Products had she known they were not, in fact, "All Natural" because they contained GMOs and other artificial and synthetic ingredients.

24.     Ms. Cooke paid for "All Natural" Products, but she received Products that were not "All Natural."  Specifically, she received Products made from canola oil that was genetically manipulated in a laboratory to exhibit traits canola oil does not possess in nature.  Further, the Products she purchased were otherwise synthetic as described herein (*e.g.*, because the particular Products contain maltodextrin).

25.     The Products Ms. Cooke received were unlawfully misbranded, worth less than the Products for which she paid, and rendered valueless. Ms. Cooke was injured in fact and lost money as a result of Defendant's improper conduct.

26.     Ms. Cooke is still interested in purchasing the Products and intends to purchase the Products in the future based upon the assumption that Defendant will have removed the non-natural ingredients in response to this litigation; certain state law prohibiting the labeling of products as natural that contain GMOs; and, the fact that one of Defendant's major competitors that characterizes its competing products as natural has removed GMOs from its products as a result of litigation.  However, if she purchases the Products again in their presently labeled and formulated condition, there is a possibility that she will reencounter and repurchase a Product that is not what it is represented to be in that the Products still contain GMOs.  If that is the case, then Plaintiff will have purchased a "noncompliant" misleadingly labeled Product.

**Plaintiff Rahsaan Ashford**

27.     Plaintiff Rahsaan Ashford is a consumer residing in the city of Glencoe, Illinois.

28.     During the period from June 2009 to March 2011, Mr. Ashford purchased the following Products for his personal consumption:

- Snyder's of Hanover The Pounder Thins Pretzels;
- Snyder's of Hanover The Pounder Sticks Pretzels;
- Cape Cod Kettle Cooked Potato Chips Original; and
- Cape Cod Kettle Cooked Potato Chips Sea Salt & Vinegar.

from Target in Glenview, Illinois, and Myers in Chicago, Illinois.

29.     The packaging of the Products Mr. Ashford purchased contained the representation that they were "All Natural."

30.     Mr. Ashford believed Defendant's representation that the Products were "All Natural."  He relied on the "All Natural" representation in making his purchase decisions and would not have purchased the Products had he known they were not, in fact, "All Natural" because they contained GMOs and other artificial and synthetic ingredients.

31.     Mr. Ashford paid for "All Natural" Products, but he received Products that were not "All Natural."  Specifically, he received Products made from canola oil that was genetically manipulated in a laboratory to exhibit traits canola oil does not possess in nature.  Further, he received Products containing enriched flour, which is not natural because it is highly processed (as described below) and because it includes niacin (synthetic), thiamine mononitrate (synthetic), and folic acid (synthetic).  Further, the Products he purchased were otherwise synthetic as described herein (*e.g.*, because the particular Products contain maltodextrin).

32.     The Products Mr. Ashford received were worth less than the Products for which

10

he paid. Mr. Ashford was injured in fact and lost money as a result of Defendant's improper conduct.

33. Mr. Ashford is still interested in purchasing the Products and intends to purchase the Products in the future based upon the assumption that Defendant will have removed the non-natural ingredients in response to this litigation; certain state law prohibiting the labeling of products as natural that contain GMOs; and, the fact that one of Defendant's major competitors that characterizes its competing products as natural has removed GMOs from its products as a result of litigation. However, if he purchases the Products again in their presently labeled and formulated condition, there is a possibility that he will reencounter and repurchase a Product that is not what it is represented to be in that the Products still contain GMOs. If that is the case, then Plaintiff will have purchased a "noncompliant" misleadingly labeled Product.

**Plaintiff Anne Steimle**

34. Plaintiff Anne Steimle is a consumer residing in Missouri.

35. Beginning in 2011 and continuing until at least November 2013, Ms. Steimle purchased Snyder's of Hanover The Pounder Sticks Pretzels at a Schnucks supermarket located at 6920 Olive Boulevard, St. Louis, Missouri, approximately one (1) time per month for her personal consumption.

36. During summer 2013, Ms. Steimle purchased a bag of Cape Cod Kettle Cooked Potato Chips Original from the Schnucks supermarket identified above on one (1) occasion for her personal consumption.

37. The packaging of the Products Ms. Steimle purchased contained the representation that they were "All Natural."

38. Ms. Steimle believed Defendant's representation that the Products were "All

11

Natural."  She relied on the "All Natural" representation in making her purchase decisions and would not have purchased the Products had she known they were not, in fact, "All Natural" because they contained GMOs and other artificial and synthetic ingredients.

39.     Ms. Steimle paid for "All Natural" Products, but she received Products that were not "All Natural."  Specifically, she received Products made from canola oil that was genetically manipulated in a laboratory to exhibit traits canola oil does not possess in nature.  Further, she received Products containing enriched flour, which is not natural because it is highly processed (as described below) and because it includes niacin (synthetic), thiamine mononitrate (synthetic), and folic acid (synthetic).  Further, the Products she purchased were otherwise synthetic as described herein (*e.g.*, because the particular Products contain maltodextrin).

40.     The Products Ms. Steimle received were worth less than the Products for which she paid.  Ms. Steimle was injured in fact and lost money as a result of Defendant's improper conduct.

41.     Ms. Steimle is still interested in purchasing the Products and intends to purchase the Products in the future based upon the assumption that Defendant will have removed the non-natural ingredients in response to this litigation; certain state law prohibiting the labeling of products as natural that contain GMOs; and, the fact that one of Defendant's major competitors that characterizes its competing products as natural has removed GMOs from its products as a result of litigation.  However, if she purchases the Products again in their presently labeled and formulated condition, there is a possibility that she will reencounter and repurchase a Product that is not what it is represented to be in that the Products still contain GMOs.  If that is the case, then Plaintiff will have purchased a "noncompliant" misleadingly labeled Product.

**Defendant Snyder's-Lance, Inc.**

42.     Snyder's-Lance, Inc. is a corporation organized under the laws of the State of North Carolina.

43.     Defendant maintains its principal place of business at 13024 Ballantyne Corporate Place, Suite 900, Charlotte, North Carolina 28277.

44.     Defendant's mailing address is Post Office Box 32368, Charlotte, North Carolina 28232-2368.

## FACTUAL ALLEGATIONS

### Defendant Advertises and Markets Snyder's Snacks and Cape Cod Chips, as "All Natural," "Natural," or "Naturals"

45.     Throughout the period from November 13, 2007, through the present, Defendant systematically marketed and advertised the Products as "All Natural," "natural," and/or "naturals" on the Product packaging.

46.     Defendant prominently placed the words "All Natural," "natural," and/or "naturals" on the front of every package of the Products, as illustrated in the representative images attached hereto and incorporated herein as **Exhibit 1**.

47.     Defendant prominently features the "All Natural" representation on each of the Snyder's Snacks labels in a central location.

48.     Similarly, Defendant prominently features an "All Natural" stamp on each of the Cape Cod Chips labels.

49.     By consistently and systematically marketing and advertising the Products as "All Natural," "natural," and/or "naturals" on the Products' packaging throughout the period from November 13, 2007, through the present and throughout the United States, Defendant ensured

13

that all consumers purchasing the Products would be, and all consumers purchasing the Products were, exposed to Defendant's misrepresentation that the Products are "All Natural," "natural," and/or "naturals."

### GMOs Are Not Natural

50.     GMOs are not "natural" or "naturals."  They are, of course, not "All Natural."  As more fully alleged below, "unnatural" is a defining characteristic of genetically-modified foods.

51.     As of January 2010, Monsanto was the world's dominant producer of genetically-modified seeds; 80% of the U.S. corn crop is grown with seeds containing Monsanto's technology.[5]

52.     Monsanto defines GMOs as "Plants or animals that **have had their genetic makeup altered to exhibit traits that are not naturally theirs**.  In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism."[6]

53.     Romer Labs, a company that provides diagnostic solutions to the agricultural industry, discusses and defines GMOs as follows: "Agriculturally important plants are often genetically modified by the insertion of DNA material from outside the organism into the plant's DNA sequence, allowing the plant to **express novel traits that normally would not appear in**

---

5.     *See* Robert Langreth and Bruce Herper, *The Planet Versus Monsanto*, Forbes, Jan. 18, 2010, *available at* http://www.forbes.com/forbes/2010/0118/americas-best-company-10-gmos-dupont-planet-versus-monsanto.html.

6.     Monsanto | Glossary, http://www.monsanto.com/newsviews/Pages/glossary.aspx#g (last visited Jan. 26, 2014) (emphasis added).

*nature*, such as herbicide or insect resistance.  Seed harvested from genetically modified plants will also contain these modifications."[7]

54.    The unnaturalness of GMOs is further evidenced by the explanations of health and environmental organizations, such as The World Health Organization, which defines GMOs as "organisms in which the genetic material (DNA) ***has been altered in a way that does not occur naturally***."[8]

55.    The United States Environmental Protection Agency has distinguished conventional breeding of plants from genetic engineering using modern scientific techniques:

> **What is the difference between plant-incorporated protectants produced through genetic engineering and those produced through conventional breeding?**
>
> **Conventional breeding** is a method in which genes for pesticidal traits are introduced into a plant through natural methods, such as cross-pollination. For a plant-incorporated pesticide, one would breed a plant that produces a pesticide with a sexually compatible plant that does not possess this property but possesses other properties of interest to the breeder, e.g., sweeter fruit. Then, out of the offspring, the breeder would choose the offspring plant that produces the pesticide, and therefore expresses the desired pesticidal trait, as well as producing sweeter fruit.
>
> **Genetically engineered** plant-incorporated protectants are created through a process that utilizes several different modern scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material. For example, a desired gene that

---

7.    Romer   Labs   -   Making   the   World's   Food   Safer   -   GMO, http://www.romerlabs.com/en/knowledge/gmo/ (last visited Jan. 26, 2014) (emphasis added).

8.    The World Health Organization, 20 Questions on Genetically Modified (GM) Foods, *available    at*    http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (emphasis added).

produces a desired pesticide[] (e.g., the insecticidal protein Bt from the bacterium, *Bacillus thuringiensis*) can be isolated from another organism, such as a bacterium, and then inserted into a plant. The desired gene becomes part of the plant's DNA. The plant then expresses the incorporated gene and produces the pesticidal protein as it would one of its own components.[9]

56.    Genetic engineering is not just an extension of conventional breeding.  In fact, it differs profoundly.  "As a general rule, conventional breeding develops new plant varieties by the process of *selection*, and seeks to achieve expression of genetic material which is already present within a species . . . .  Conventional breeding employs processes that occur in nature, such as sexual and asexual reproduction . . . .  Genetic engineering works primarily through *insertion* of genetic material, although gene insertion must also be followed up by selection. This insertion process does not occur in nature . . . ."[10]

57.    As indicated by the definitions and descriptions above, which come from a wide array of industry, government, and health organizations, GMOs are not "All Natural" or "natural" and cannot be accurately described as "naturals" because they do not naturally occur. GMOs are "created" artificially in a laboratory through genetic engineering.

58.    Thus, by claiming the Products are "All Natural," "natural," and/or "naturals,"

---

9.    Office of Prevention, Pesticides, and Toxic Substances, United States Environmental Protection Agency, Questions & Answers Biotechnology: Final Plant-Pesticide/Plant Incorporated Protectants (PIPs) Rules 3 (2001), *available at* http://www.epa.gov/scipoly/biotech/pubs/qanda.pdf (emphasis in original).

10.    Michael K. Hansen, Consumer Policy Institute / Consumers Union, Genetic Engineering Is Not An Extension Of Conventional Plant Breeding; How genetic engineering differs from conventional breeding, hybridization, wide crosses and horizontal gene transfer 1 (2000), *available at* http://consumersunion.org/wp-content/uploads/2013/02/Wide-Crosses.pdf (emphasis in original).

Defendant deceives and misleads reasonable consumers, since the Products contain GMOs.

**Defendant's Products Contain GMOs**

59.     The Products contain GMOs.

60.     As discussed below, the canola oil, soybean oil, corn oil, corn syrup solids, corn starch, modified corn starch, maltodextrin, and dextrose found within the Products have been produced using GMO rapeseed, soy, and corn crops, as appropriate.

61.     Rapeseed is used to make the common ingredient canola oil.

62.     Rapeseed, soy, and corn are prevalent GMO products.

63.     Indeed, approximately 90% of United States canola crops in commercial production contain GMOs.[11]

64.     Approximately 94% of United States soy crops in commercial production contained GMOs in 2011.[12]

65.     Approximately 88% of United States corn crops in commercial production contained GMOs in 2011.[13]

66.     The corn oil, corn syrup solids, corn starch, modified corn starch, maltodextrin, and dextrose in the Products are produced using GMO corn.

---

11.     What is GMO? | The Non-GMO Project, http://www.nongmoproject.org/learn-more/what-is-gmo/ (last accessed Jan. 26, 2014).

12.     *Id.*

13.     *Id.*

**Defendant's Products Contain Other Synthetic, Artificial,
and/or Highly Processed Ingredients, All of Which Are Not Natural**

67.     The Products also contain a variety of other synthetic, artificial, and/or heavily processed, unnatural ingredients, including canola oil, soybean oil, enriched flour, niacin, thiamine mononitrate, folic acid, yellow corn or white corn enriched with various substances, maltodextrin, dextrose, disodium phosphate, and artificial colors (*i.e.*, oleoresin paprika, paprika extract, caramel color, and annatto extract).

68.     ***Canola Oil and Soybean Oil*** are highly processed ingredients.  The various processes by which the raw rapeseed and soy ingredients are converted to these oils render the final oils chemically-derived and unnatural, with the oils no longer bearing any chemical resemblance to their source crops.  In oil manufacture, the rapeseed and soybean ingredients undergo several distinct chemical processes: (1) extraction; (2) alkalineutralization; (3) bleaching; (4) deodorizing; and (5) conditioning, described in more detail below:

(1)     *Extraction:* First, the manufacturer physically presses the rapeseed or soybeans, which typically extracts a small portion of the extractable oil.  Next, the vegetables are treated with hexane, a chemical linked to cancer and other major health problems in studies conducted on animals, to extract the remaining crude oil. Residual hexane may be present in the final product.

(2)     *Alkalineutralization:* After extraction, the oil is neutralized with an alkaline soap solution that separates and removes the free fatty acids.  The soap solution is separated from the neutralized oil using a centrifuge.  Potassium hydroxide, a corrosive acid, is used to facilitate the reaction between the alkaline solution and the free fatty acids.

(3)     *Bleaching:* After alkalineutralization, the oil is bleached with cleaning solutions to lighten its color.

(4)     *Deodorizing:* After bleaching, the oil is deodorized with additional cleaning products to minimize its odor.

18

(5)     *Conditioning:* After being deodorized, the oils are conditioned by the use of high-concentration phosphoric acid, consumption of which has been linked to lower bone density and chronic kidney disease.

69.     ***Enriched Flour*** is a highly processed form of wheat flour that has been rendered into an artificial, unnatural ingredient. Enriched flour is formed when wheat seeds are ground to remove the outer layer of the seed and rend a fine light brown or yellowish flour. During this process, almost all nutrients are removed from the flour, leaving a product that is void of its natural nutritional properties. The flour is then synthetically bleached with chemical additives, such as benzoyl peroxide or chlorine, to give it an artificial, unnatural white color. After bleaching, the flour then has synthetic substances added to it in an attempt to restore nutritional value to the product. Several of these synthetic substances, all of which are included in the Products containing enriched flour, are described in more detail below:

a.      ***Niacin*** is a synthetic form of vitamin B3 formed from 3-methylpyridine.

b.      ***Thiamine Mononitrate*** ($C_{12}H_{17}N_5O_4S$) is a mononitrate salt of thiamine. It is chemically distinct from thiamine (vitamin B1), $C_{12}H_{17}ClN_4OS$. Thiamine mononitrate is a synthetic substance prepared from thiamine hydrochloride (also synthetic) by dissolving the hydrochloride salt in alkaline solution followed by precipitation of the nitrate half-salt with a stoichiometric amount of nitric acid.[14]

c.      ***Folic Acid*** is the chemical *N*-[4-[[(2-amino-1,4-dihydro-4-oxo-6-pteridinyl)methyl]amino]benzoyl]-*L*-glutamic acid.[15] Folic acid is synthetically created. Folic acid differs from natural folate in numerous respects, including shelf-life and bio-availability. The molecular structure of folic acid is also different from that of natural folate.

---

14.     21 C.F.R. § 184.1878.

15.     21 C.F.R. § 172.345(a).

70.     ***Yellow Corn (enriched with thiamine, riboflavin, niacin, iron, folic acid) and White Corn (enriched with thiamine, riboflavin, niacin, iron, folic acid)*** are not natural because natural corn is not enriched with the various substances listed in parentheses.  Further, these corn ingredients are not natural because niacin and folic acid are not natural, as discussed above.

71.     ***Maltodextrin*** is a saccharide polymer that is produced through partial acid and enzymatic hydrolysis of corn starch.  The acid hydrolysis process has been specifically deemed to be a "[r]elatively severe process" that renders an ingredient no longer "natural."

72.     ***Dextrose*** is enzymatically synthesized in a manner similar to the synthesis of maltodextrin, crystallizing D-glucose with one molecule of water.

73.     Synthetic chemicals are often used to extract and purify the enzymes used to produce maltodextrin and dextrose.  The microorganisms, fungi, and bacteria used to produce these enzymes are also often genetically-modified.

74.     ***Disodium Phosphate*** is a synthetic preservative that inhibits the effects of oxygen on food.  It is produced by neutralization of phosphoric acid, a synthetic pollutant.[16]

75.     ***Oleoresin Paprika, Paprika Extract, Caramel Color, and Annatto Extract*** are added colors.  Stating its policy, the United States Food and Drug Administration explains, "[s]ince all added colors result in an artificially colored food, we would object to the declaration of any added color as 'food' or 'natural.'"[17]

---

16.     *See* 40 C.F.R. § 116.4 (identifying phosphoric acid as a hazardous substance).

17.     Compliance Policy Guides > CPG Sec. 587.100 Label Declaration of Certification-Exempt                                      Color                                      Additives,

76.     Discovery is necessary to uncover the true nature of other ingredients in Defendant's Products.

77.     Despite the presence of all of the above-listed unnatural artificial and synthetic ingredients in many of the Products, Defendant markets the Products as "All Natural," "natural," and/or "naturals."

### Defendant Deceptively Markets the Products as "All Natural," "Natural," and/or "Naturals" to Induce Consumers, Including Plaintiffs and the Class Members, to Purchase the Products

78. According to Consumers Union, "Eighty-six percent of consumers expect a 'natural' label to mean processed foods do not contain any artificial ingredients."[18]

79.     A representation that a product is "All Natural," "natural," and/or "naturals" is material to a reasonable consumer.

80.     Nearly seven in 10 consumers surveyed by researcher Mintel said they were "very" or "somewhat" interested in natural products.[19]

81.     In surveys by Brand Keys consultancy, "natural ingredients" ranks second only to

---

http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074644.htm (last visited Jan. 27, 2014).

18.     Urvashi Rangan, Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 C.F.R. Part 260, Notice of the Federal Trade Commission (2010), *available at* www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00289%C2%A0/00289-57072.pdf (also accessible as Comment 58 at http://www.ftc.gov/policy/public-comments/initiative-353).

19.     Bruce Horovitz, *Frito-Lay turns to nature's path*, USA TODAY, Dec. 28, 2010, *available at* http://www.usatoday.com/printedition/news/20101228/fritonatural28_st.art.htm.

"taste" in influencing consumer purchasing behavior.[20]

82. Defendant is well aware that claims of food being "All Natural," "natural," and/or "naturals" are material to consumers.

83. This is evidenced by Defendant's marketing of the Products as "All Natural," "natural," and/or "natural" throughout the period from November 13, 2007, through the present, prominently on the front labels of all of the Products.

84. Defendant markets and advertises the Products as "All Natural," "natural," and/or "naturals" to increase sales of the Products.

85. In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled "All Natural," "natural," and/or "naturals" over comparable products not so labeled, furthering Defendant's private interest of increasing sales for its Products and decreasing the sales of products that Defendant's competitors truthfully offer as "All Natural," "natural," and/or "naturals."

### Plaintiffs and the Class Members Reasonably Relied on Defendant's Misrepresentations

86. Defendant made the deceptive representations and omissions on the Products with the intent to induce Plaintiffs and the other Class members to purchase the Products.

87. Defendant's deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

---

20. *Id.*

88.     Defendant's misleading affirmative statements about the "naturalness" of its Products obscured the material facts that Defendant failed to disclose about the unnaturalness of its Products.

89.     Consumers frequently rely on food label representations and information in making purchase decisions.

90.     Plaintiffs and the other Class members reasonably relied to their detriment on Defendant's misleading representations and omissions.

91.     Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiffs and the other Class members.

**Defendant's Wrongful Conduct Caused Plaintiffs' and the Class Members' Injuries**

92.     As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiffs and the other Class members in that they:

    a.     paid a sum of money for Products that were not as represented;

    b.     paid a premium price for Products that were not as represented;

    c.     paid for Products that were unlawfully misbranded and rendered valueless;

    d.     were deprived the benefit of the bargain because the Products they purchased were different from what Defendant warranted;

    e.     were deprived the benefit of the bargain because the Products they purchased had less value than what Defendant represented;

    f.     did not receive Products that measured up to their expectations as created by Defendant;

g.  ingested a substance that was of a different quality than what Defendant promised; and

h.  were denied the benefit of the beneficial properties of the natural foods promised.

93.   Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiffs and the other Class members would not have been injured.

94.   Plaintiffs paid for Products that were "All Natural," "natural," and/or "naturals," but received Products that were not "All Natural," "natural," or "naturals."  The Products Plaintiffs received were worth less than the Products for which they paid.

95.   Defendant's advertising for the Products was and is false, misleading, and/or likely to deceive reasonable consumers. Therefore, the Products are misbranded and valueless, worth less than what Plaintiff and members of the Class paid for them, and/or are not what Plaintiff and members of the Class reasonably intended to receive.

96.   Based on Defendant's misleading and deceptive representations, Defendant was able to and did charge a premium price of the Products over the cost of competitive products not bearing an "all natural," "natural," or "naturals" label.

97.   Plaintiffs and the other Class members all paid money for the Products.  However, Plaintiffs and the other Class members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions.  Plaintiffs and the other Class members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products.  Consequently, Plaintiffs and the other Class members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

98.   Attached hereto as **Exhibit 3** and incorporated by reference herein is a chart showing the differences in price between Defendant's Products at issue and competing products

24

that are not labeled "All Natural," "natural," or "naturals."

99.     The Snyder's Snacks cost approximately $3.49 per sixteen (16) ounce bag, or $0.22 per ounce.

100.    Rival brands that do not contain the false and misleading "All Natural" representation cost less than the Snyder's Snacks.  For example, Rold Gold One Pound Classic Style Tiny Twists Pretzels cost only approximately $2.98 per sixteen (16) ounce bag, or $0.19 per ounce.  For another example, Anderson Old Fashioned Stick Pretzels cost approximately $7.99 per forty (40) ounce container, or approximately $0.20 per ounce.  Further, Santitas Tortilla Triangles White Corn Blend cost $2.00 for one (1) bag of eleven (11) ounces, or $0.18 per ounce.

101.    Thus, to purchase the Snyder's Snacks, which Defendant falsely and misleadingly labels "All Natural," Plaintiffs and the Class members paid a premium over comparable products that are not labeled "All Natural," "natural," or "naturals," as follows:

- Plaintiffs and the Class members paid a premium of approximately $0.03 per ounce for the Snyder's Snacks, as compared to Rold Gold One Pound Classic Style Tiny Twist Pretzels;

- Plaintiffs and the Class members paid a premium of approximately $0.02 per ounce for the Snyder's Snacks, as compared to Anderson Old Fashioned Stick Pretzels; and

- Plaintiffs and the Class members paid a premium of approximately $0.04 per ounce for the Snyder's Snacks, as compared to Santitas Tortilla Triangles White Corn Blend.

102.    The Cape Cod Chips cost approximately $45.48 for twelve (12) bags of eight (8)

ounces each, or approximately $0.47 per ounce.[21]

103.   Rival brands that do not contain the false and misleading "All Natural" representation cost less than the Cape Cod Chips.   For example, Rye Street Kettle Cooked Potato Chips Original Lightly Salted cost $33.99 for fifty-five (55) bags of one and a half (1.5) ounces each, or $0.41 per ounce.

104.   Thus, to purchase the Cape Cod Chips, which Defendant falsely and misleadingly labels "All Natural," Plaintiffs and the Class members paid a premium of approximately $0.06 per ounce over Rye Street Kettle Cooked Potato Chips Original Lightly Salted, which are not labeled "All Natural."

105.   Because the Products are unlawfully misbranded and/or sold pursuant to an unfair business practice, and there is no market value for an unlawful product in the legal marketplace, Plaintiffs and the Classes seek damages equal to the aggregate retail purchase price paid for the Products during the Class Period and injunctive relief described below, entitling each class member to a full refund for each Product purchased, even though alternatively, the Products may have been rendered completely valueless for all consumers. *See Bohlke V. Shearer's Foods, LLC*, Case No. 9:14-cv-80727-RLR, Order on Mot. to Dismiss (Dkt. No. 55, p. 15) (S.D. Fla. Jan. 20, 2015).

106.   Alternatively, Plaintiffs and members of the Classes paid a price premium for the "All Natural" Products, over other similar products that do not claim to be "All Natural." As a

---

21.   Cape Cod Kettle Cooked Potato Chips Original cost approximately $45.48 for 12 bags of 8.5 ounces each, or $0.45 per ounce.

result, Plaintiff and the Class are entitled to damages in the amount of the difference between the premium purchase price charged for the Products and the true market value of the Products without the false "All Natural" representation. The "price premium" is equal to the amount charged for, and pad by, Plaintiffs and members of the classes. The true market value is no more than the retail price charged for other comparable brands of products that do not claim to be "All Natural."

107.    Plaintiffs seek declaratory relief in the form of an order declaring Defendant's conduct to be unlawful and/or in violation of the below consumer protection statutes, and corresponding injunctive relief, on behalf of themselves and the Classes they seek to represent, in the form of corrective advertising, a label change, and/or an ingredient change, so that Plaintiffs and Class members can resume purchasing the Products. Plaintiffs do not want to suffer damages again in the future by Defendant's false and deceptive advertising of the Products.

108.    The statutes under which Plaintiffs sue give them Article III standing in that Plaintiffs and proposed Class face a real and immediate threat of future harm in the form of deceptively labeled, packaged and marketed Products that violate the rights given to consumers under the consumer protection statutes pled here.  For example, pursuant to FDUTPA, FLA. STAT. § 501.211, "anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated." *See also Dye v. Bodacious Food Co.*, Case No. 9:14-cv-80627-WPD, Order Denying Mot. to Dismiss (Dkt. No. 14, at p. 7) (S.D. Fla. Sept. 9, 2014) (stating, "FDUTPA 'is a broadly worded to authorize declaratory and injunctive relief even if those remedies might no benefit the individual consumers who filed the suit . . . .  There is no requirement that a plaintiff show an

27

ongoing practice or irreparable harm, and declaratory relief is available regardless of whether an adequate remedy at law also exists.") (citing *Galstaldi v. Sunvest Comtys. USA, LLC*, 637 F. Supp. 2d 1045, 1057 (S.D. Fla. 2009); *see also Kelly v. Palmer, Reifler, & Assocs., P.A.* 681 F. Supp. 2d 1356, 1366 (S.D. Fla. 2010) (Fla. Stat. § 501.211 (1) permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act.").

109.     The injunctive power authorized by the controlling consumer protection statutes includes both prohibitory relief (ordering Defendant to stop engaging in deceptive and unfair advertising) and mandatory injunctive relief (requiring Defendant to engage in a corrective advertising campaign).  *See, e.g., Global Tel*Link Corp. v. Scott*, 652 F.Supp.2d 1240 (Fla. Dist. Ct. 2009); *Corn Const., Inc. v. Broward County Bldg. and Const. Trades Council*, 268 So.2d 438 (Fla. App. 1972). Thus, because Plaintiffs were "injured by Defendant's unfair and deceptive practices regarding the Products, . . . .[Plaintiffs have] standing for injunctive relief . . ." *Dye*, No. 9:14-cv-80627, at p. 7; *see also Henderson v. Gruma Corp.*, No. CV10-04173 AHM (AJWx), 2011 WL 1362188, * 7 (C.D. Cal. April 11, 2011); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. Nov. 27, 2012); *Davis v. Powertel, Inc.* 776 So. 2d 971 (Fla. 1st DCA 2000).

### Defendant's Conduct Has Caused Injury to Class Members Having a Substantial In-State Effect on North Carolina Trace and Commerce

110.     Defendant is one of the larger employees in North Carolina and North Carolina is the location of many of the key persons and business units of Defendant.  The Defendant is headquartered in North Carolina and most of the key decision makers regarding use of the allegedly misleading Natural representations at issue here are based in North Carolina.

111.     As a result, Defendant and its conduct has a substantial in-state effect on North

Carolina trade and commerce.

112.   Defendant recognized in its 10-K filed with the Securities and Exchange Commission on March 4, 2015 that public concern regarding its products and ingredients, and litigation focusing on those concerns (such as the above-captioned action), could adversely impact it. As stated in its most recent 10-K:

> ***Concerns with the safety and quality of certain food products or ingredients could cause consumers to avoid our products.***
>
> We could be adversely affected if consumers in our principal markets lose confidence in the safety and quality of certain products or ingredients. Negative publicity about these concerns, whether or not valid, may discourage consumers from buying our products or cause disruptions in production or distribution of our products and negatively impact our business and financial results.
>
> ***If our products become adulterated, misbranded or mislabeled, we might need to recall those items and we may experience product liability claims if consumers are injured or become sick.***
>
> We may need to recall some of our products if they become adulterated or if they are mislabeled, and may also be liable if the consumption of any of our products causes injury to consumers. A widespread recall could result in significant losses due to the costs of a recall, the destruction of product inventory, and lost sales due to the unavailability of the affected product for a period of time. A significant product recall or product liability claim could also result in adverse publicity, damage to our reputation, and a loss of consumer confidence in the safety and/or quality of our products, ingredients or packaging. Such a loss of confidence could occur even in the absence of a recall or a major product liability claim. We also may become involved in lawsuits and legal proceedings if it is alleged that the consumption of any of our products causes injury or illness. A product recall or an adverse result in any such litigation could have an adverse effect on our operating and financial results. We may also lose customer confidence for our entire Branded portfolio as a result of any such recall or proceeding.

Snyder's 10-K dated March 4, 2015, pages 6, 7.

## **CLASS ALLEGATIONS**

113.     Plaintiffs incorporate all above allegations by reference as though fully set forth herein.

114.     **Nationwide Classes.**  Pursuant to Federal Rule of Civil Procedure ("Rule") 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and on behalf of a nationwide class (the "Nationwide (b)(2) Class"), defined as follows:

> All persons who purchased one or more of the Products in the United States and its territories during the period from November 13, 2009, to the date of class certification.

115.     Additionally, pursuant to Rule 23(a) and (b)(3), Plaintiffs bring this action on behalf of themselves and on behalf of a nationwide class (the "Nationwide (b)(3) Class"), defined as follows:

> All persons who purchased one or more of the Products in the United States and its territories during the period from November 13, 2009, to the date of class certification.

116.     Additionally, or in the alternative, Plaintiffs bring this action on behalf of themselves and on behalf of several statewide classes,[22] as follows:

> a.     **Florida Classes.**  Pursuant to Rule 23(a) and (b)(2), Plaintiffs Adele Ferrara, and Dana Cooke bring this action on behalf of themselves and a class of all persons who purchased one or more of the Products in the State of Florida during the period from November 13, 2009, to the date of class certification (the "Florida (b)(2) Class").

---

22.     This Amended Complaint refers to the Nationwide Classes and all of the statewide classes identified in this paragraph, collectively, as the "Class" or the "Classes."

    b.        Pursuant to Rule 23(a) and (b)(3), Plaintiffs Adele Ferrara and Dana Cooke bring this action on behalf of themselves and a class of all persons who purchased one or more of the Products in the State of Florida during the period from November 13, 2009, to the date of class certification (the "Florida (b)(3) Class").[23]

    c.        **Illinois Classes.**  Pursuant to Rule 23(a) and (b)(2), Plaintiff Rahsaan Ashford brings this action on behalf of herself and a class of all persons who purchased one or more of the Products in the State of Illinois during the period from November 13, 2009, to the date of class certification (the "Illinois (b)(2) Class").

    d.        Pursuant to Rule 23(a) and (b)(3), Plaintiff Rahsaan Ashford brings this action on behalf of herself  and a class of all persons who purchased one or more of the Products in the State of Illinois during the period from November 13, 2009, to the date of class certification (the "Illinois (b)(3) Class").[24]

    e.        **Missouri Classes.**  Pursuant to Rule 23(a) and (b)(2), Plaintiff Anne Steimle brings this action on behalf of herself and a class of all persons who purchased one or more of the Products in the State of Missouri during the period from November 13, 2009, to the date of class certification (the "Missouri (b)(2) Class").

    f.        Pursuant to Rule 23(a) and (b)(3), Plaintiff Anne Steimle brings this action on behalf of herself and a class of all persons who purchased one or more of the Products in the State of Missouri during the period from November 13, 2009, to the date of class certification (the "Missouri (b)(3) Class").[25]

117.    Excluded from the Classes are Defendant, its subsidiaries, affiliates, and

---

23.    This Amended Complaint refers to the Florida (b)(2) Class and the Florida (b)(3) Class, together, as the "Florida Class" or the "Florida Classes."

24.    This Amended Complaint refers to the Illinois (b)(2) Class and the Illinois (b)(3) Class, together, as the "Illinois Class" or the "Illinois Classes."

25.    This Amended Complaint refers to the Missouri (b)(2) Class and the Missouri (b)(3) Class, together, as the "Missouri Class" or the "Missouri Classes."

employees; all persons who make a timely election to be excluded from the Classes; governmental entities; and the judge(s) to whom this case is assigned and any immediate family members thereof.

118.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

## Numerosity—Federal Rule of Civil Procedure 23(a)(1)

119.    The members of each of the Classes are so numerous that individual joinder of all class members is impracticable.

120.    The precise number of members of the Classes is unknown to Plaintiffs, but it is clear that the number greatly exceeds the number that would make joinder practicable, particularly given Defendant's comprehensive nationwide distribution and sales network.

121.    Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

## Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and (b)(3)

122.    This action involves common questions of law or fact, which predominate over any questions affecting individual members of the Classes.  All members of the Classes were exposed to Defendant's deceptive and misleading advertising and marketing claims that the Products are "All Natural," "natural," and/or "naturals" because those claims were on the

packaging of each and every Product.[26]  Furthermore, common questions of law or fact include:

    a.    whether Defendant engaged in the conduct as alleged herein;

    b.    whether Defendant' practices violate applicable law cited herein;

    c.    whether Plaintiffs and the other members of the Classes are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

    d.    whether Plaintiffs and the other members of the Classes are entitled to equitable relief, including but not limited to injunctive relief and restitution.

123.    Defendant engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually and on behalf of the other members of the Classes. Similar or identical statutory and common law violations, business practices, and injuries are involved.  Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.  Moreover, the common questions will yield common answers.

### Typicality—Federal Rule of Civil Procedure 23(a)(3)

124.    Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were comparably injured through the uniform misconduct described above, were subject to Defendant's false, deceptive, misleading, and unfair advertising and marketing practices and representations, including the false claims that the Products are "All Natural," "natural," and/or "naturals."  Further, there are no defenses available to Defendant that are unique to Plaintiffs.

---

26.    The claims "All Natural," "natural," and "naturals" are not materially distinct.

**Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)**

125.    Plaintiffs are adequate representatives of the members of the Classes because their interests do not conflict with the interests of the other members of the Classes they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs will prosecute this action vigorously.  The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.  The Law Offices of Howard W. Rubinstein, P.A.; Reese Richman LLP; Halunen Law, and Eggnatz, Lopatin & Pascucci, LLP have long been leaders in the representation of consumers in a wide variety of actions nationwide where they have sought to protect consumers from fraudulent and deceptive practices. *See* http://hwrlawoffice.com;            http://www.reeserichman.com/cases/consumer-fraud.html; http:www/halunenlaw.com; www.ELPLawyers.com

**Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)**

126.    Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

**Superiority—Federal Rule of Civil Procedure 23(b)(3)**

127.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.  Even if the members of the Classes could afford individual litigation, the court system

34

could not.   Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.   By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.   Given the similar nature of the members of the Classes' claims and the absence of material or dispositive differences in the statutes and common laws upon which the claims are based when such claims are grouped as proposed above and below the Classes will be easily managed by the Court and the parties.

## CAUSES OF ACTION

## COUNT I

**(Violation of North Carolina's Unfair and Deceptive Trade Practices Act,
N.C. Gen. Stat. § 75-1 *et seq.*)
(By Plaintiffs, on Behalf of Themselves and the Nationwide Classes)**

128.    Plaintiffs re-allege and incorporate by reference he allegations set forth in the preceding paragraphs numbered one (1) through one hundred ninety-three (193) as if fully set forth herein.

129.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Classes, pursuant to North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*

130.    North Carolina General Statutes section 75-1.1 states, in pertinent part:

> Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

N.C. Gen. Stat. § 75-1.1(a).

131.    As fully alleged above, by labeling, advertising, marketing, distributing, and/or selling the Products with claims that they are "All Natural," "natural," and/or "naturals" to Plaintiffs and the Class members, Defendant engaged in, and continues to engage in, unfair or deceptive acts or practices in or affecting commerce because the Products are in fact made from GMOs and other artificial and synthetic ingredients, which are not natural.

132.    Plaintiffs and the Class members believed Defendant's representations that the Products they purchased were "All Natural," "natural," and/or "naturals."  Plaintiffs and the Class members would not have purchased the Products at a premium price had they known the Products were not actually "All Natural," "natural," and/or "naturals" because they contained

36

GMOs and other artificial and synthetic ingredients.

133.    Plaintiffs and the Class members were injured in fact and lost money as a result of Defendant's conduct of improperly describing the Products as "All Natural," "natural," and/or "naturals."  Plaintiffs and the Class members paid for "All Natural," "natural," and/or "naturals" Products, but did not receive such Products.

134.    The Products Plaintiffs and the Class members received were worth less than the Products for which they paid.  Plaintiffs and the Class members paid a premium price on account of Defendant's misrepresentations that the Products were "All Natural," "natural," and/or "naturals."

135.    Plaintiffs and the Class members seek to enjoin such unlawful, deceptive acts and practices described above.  Each of the Class members will be irreparably harmed unless the Court enjoins Defendant's unfair and deceptive acts and practices in that Defendant will continue to falsely and misleadingly advertise the Products as "All Natural," "natural," and/or "naturals."

136.    Plaintiffs and the Class members seek damages to the full extent permitted by law, declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under North Carolina General Statutes sections 75-16 and 75-16.1.

137.    Therefore, Plaintiffs pray for relief as set forth below.

## COUNT II

**(Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201 *et seq.*)**
**(By Plaintiffs Adele Ferrera, Dana Cooke, Gabriel Ibertis, and Steve Trout,**
**On Behalf of Themselves and the Florida Classes)**

138.    Plaintiffs Adele Ferrera and Dana Cooke re-allege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

139.    Plaintiffs Ferrera and Cooke bring this claim on behalf of themselves and on behalf of the other members of the Florida Classes, pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (the "FDUTPA").

140.    Section 501.204(1) of the FDUTPA makes "unfair or deceptive acts or practices in the conduct or any trade or commerce" unlawful.

141.    By labeling, advertising, marketing, distributing, and/or selling the Products with claims that they were "All Natural," "natural," and/or "naturals" to Plaintiffs Ferrera and Cooke and the Florida Class members, Defendant violated the FDUTPA by engaging in, and it continues to violate the FDUTPA by continuing to engage in, unfair or deceptive acts or practices, by falsely and misleadingly describing the composition of the Products, which are made from GMOs and other artificial and synthetic ingredients, which are not natural.

142.    Had Plaintiffs Ferrera and Cooke and the Florida Class members known the Products were not "All Natural," "natural," and/or "naturals" because they contained non-natural genetically-modified ingredients and other artificial and synthetic ingredients, they would not have purchased the Products and/or paid a premium price for the Products, as detailed herein.

143.    In addition, the practice employed by Defendant, whereby Defendant sold, promoted and marketed that its products as "All Natural" when they are not constitutes a *per se*

38

violation of FDUTPA under Section 501.203(3)(c) because it is in violation of the Florida Food

Safety Act, Fla. Stat. § 500.04 (1) and (2) in that said products are misbranded.

144.    Defendant's false, unlawful, and misleading product descriptions render its

products misbranded under Florida law. Specifically, Section 500.04 of the Florida Food Safety

Act prohibits the manufacture, sale or delivery of "misbranded food." Food is "misbranded"

when "its labeling is false or misleading in any particular." Fla. Stat. § 500.11(1)(a) & (b). A

food is considered mislabeled unless the proper disclosures are made "on the outside container or

wrapper" on the product. § 500.03(1)(t). Misbranded products cannot be legally sold and are

legally worthless.

145.    Plaintiffs Ferrera and Cooke and the Florida Class members were injured in fact

and lost money as a result of Defendant's conduct of improperly describing the Products as "All

Natural," "natural," and/or "naturals."   Plaintiffs Ferrera and Cooke and the Florida Class

members paid for Products that were "All Natural," "natural," and/or "naturals," but did not

receive such Products.

146.    The Products Plaintiffs Ferrera and Cooke and the Florida Class members

received were worth less than the Products for which they paid.

147.    Plaintiffs Ferrera and Cooke and the other Florida Class members seek to enjoin

such unlawful acts and practices described above.  Each of the Florida Class members will be

irreparably harmed unless the unlawful actions of Defendant are enjoined in that they will

continue to be unable to rely on the Defendant's representations that the Products are "All

Natural," "natural," and/or "naturals."

148.    Plaintiffs Ferrera and Cooke and the Florida Class members seek declaratory

relief, injunctive relief prohibiting Defendant from continuing to disseminate its false and

misleading statements, actual damages plus attorney's fees and court costs, and other relief allowable under the FDUTPA.

149.    Therefore, Plaintiffs Ferrera and Cooke pray for relief as set forth below.

## COUNT III

**(Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*)**
**(By Plaintiffs Rahsaan Ashford ,**
**On Behalf of Himself and the Illinois Classes)**

150.    Plaintiff Rahsaan Ashford re-alleges and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

151.    Mr. Ashford asserts this claim on behalf of himself and on behalf of the Illinois Classes, pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the "ICFA").

152.    Section 2 of the ICFA provides, in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2 (footnotes omitted).

153.    Under the ICFA, the term "consumer" means "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or

business but for his use or that of a member of his household."  815 ILCS 505/1(e).

154.    Under the ICFA, the terms "trade" and "commerce" mean "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." 815 ILCS 505/1(f).

155.    Mr. Ashford and the Illinois Class members have standing to assert this claim because they are "consumers" within the meaning of the ICFA, and Defendant addresses its practices to the market generally and otherwise implicates consumer protection concerns.  At all relevant times, Defendant conducted "trade" and "commerce" within the meaning of 815 ILCS 505/1(f).

156.    As fully alleged above, by advertising, marketing, distributing, and/or selling the Products with claims that they were "All Natural," "natural," and/or "naturals" to Mr. Ashford and the Illinois Class members, Defendant violated the ICFA by engaging in, and it continues to violate the ICFA by continuing to engage in, unfair and deceptive acts or practices, since the Products, which are made from GMOs and other artificial and synthetic ingredients, are not natural.

157.    Defendant's unlawful, unfair and/or deceptive practices described herein are continuing in nature and are widespread practices.

158.    Defendant's actions, which were willful and wanton, constitute intentional violations of the ICFA.

159.    Defendant intended that Mr. Ashford  and the Illinois Class members rely on the unfair and deceptive acts and omissions alleged herein so that they would buy, and/or continue to

41

buy, Defendant's Products.

160.    Mr. Ashford and the Illinois Class members believed Defendant's representations that the Products were "All Natural," "natural," and/or "naturals."  Mr. Ashford and the Illinois Class members would not have purchased the Products had they known the Products were not, in fact, "All Natural," "natural," and/or "naturals" because they contained GMOs and other artificial and synthetic ingredients.

161.    Mr. Ashford and the Illinois Class members were injured in fact and lost money as a result of Defendant's conduct of improperly describing the Products as "All Natural," "natural," and/or "naturals."  Mr. Ashford and the Illinois Class members paid for Products that were "All Natural," "natural," and/or "naturals," but did not receive such Products.

162.    The Products Mr. Ashford  and the Illinois Class members received were worth less than the Products for which they paid.  Mr. Trout, Mr. Ashford, and Mr. Shapiro and the Illinois Class members paid a premium price on account of Defendant's misrepresentations that the Products were "All Natural," "natural," and/or "naturals."

163.    Mr. Ashford and the Illinois Class members seek to enjoin such unfair and deceptive acts and practices as described above.  Each of the Illinois Class members will be irreparably harmed unless the Court enjoins Defendant's unlawful actions, in that Mr. Ashford and the Illinois Class members will continue to be unable to rely on Defendant's representations that the Products are "All Natural," "natural," and/or "naturals."

164.    Mr. Ashford  and the Illinois Class members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, enjoining Defendant from continuing to disseminate its false and misleading statements, and other relief allowable under the ICFA.

165.    Therefore, Plaintiff Ashford prays for relief as set forth below.

## COUNT IV

**(Violation of the Missouri Merchandising Practices Act,
Mo. Rev. Stat. § 407.010 *et seq.*)
(By Plaintiff Anne Steimle, on Behalf of Herself and the Missouri Classes)**

166.    Plaintiff Anne Steimle re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

167.    Plaintiff Steimle asserts this claim on behalf of herself and on behalf of the Missouri Classes under the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.* (the "MMPA").

168.    Under the MMPA, the term "person" means "any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." Mo. Rev. Stat. § 407.010(5).

169.    Defendant, as a for-profit corporation, is a "person" as the MMPA defines that term.

170.    Under the MMPA, the term "merchandise" means "any objects, wares, goods, commodities, intangibles, real estate or services." Mo. Rev. Stat. § 407.010(4).

171.    The Products are goods and, consequently, are "merchandise" as the MMPA defines that term.

172.    Under the MMPA:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in

43

> connection with the sale or advertisement of any merchandise in
> trade or commerce . . . in or from the state of Missouri, is declared
> to be an unlawful practice.

Mo. Rev. Stat. § 407.020(1).

173.    As set forth herein, Defendant's conduct in connection with the advertising, marketing, sale, distribution, and offering of the Products violates section 407.020(1) in that, among other things, Defendant has used and/or continues to use deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact.

174.    As set forth herein, Defendant's deceptive acts, unfair practices, misrepresentations, and its concealment of material facts include, among other things, misrepresenting the Products as "All Natural, "natural," and/or "naturals," when, in fact, they are not.

175.    Defendant's conduct further violates the MMPA pursuant to state regulation 15 C.S.R. § 60-8 because the conduct: (1) offends public policy; (2) is unethical, oppressive and unscrupulous; (3) causes substantial injury to consumers; (4) was not in good faith; (5) was unfair; and (6) is unconscionable.

176.    Because Defendant used deception, fraud, false pretense, false promise, misrepresentation, unfair practice and the concealment, suppression, or omission of material facts in connection with the advertising, marketing, sale, distribution, and offering of the Products, Ms. Steimle and the members of the Missouri Class suffered economic damages.

177.    Ms. Steimle and the other members of the Missouri Class seek actual damages; a declaration that Defendant's acts, use or employment of deceptions, frauds, false pretenses, false promises, misrepresentations, unfair practices or concealments, suppressions, or omissions of

44

material facts violate the MMPA; an injunction prohibiting Defendant from continuing to engage in such unlawful acts, use, or employment; restitution; rescission; pre-judgment interest; punitive damages; attorneys' fees and costs; and any other relief that the Court deems necessary and proper.

178.   Therefore, Plaintiff Steimle prays for relief as set forth below.

## COUNT V

**(Breach of Express Warranty, Fla. Stat. § 672.313)**
**(By Plaintiffs Ferrara and Cooke**
**On Behalf of themselves and the Florida Classes)**

179.   Plaintiffs Adele Ferrera and Dana Cooke re-allege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

180.   Plaintiffs Ferrera and Cooke  bring this claim for breach of express warranty on behalf of themselves and on behalf of the other members of the Florida Classes, pursuant to Florida Statutes section 672.313.

181.   Plaintiffs Ferrera and Cooke and the Florida Class members each formed a contract with Defendant at the time they purchased the Products.  The terms of that contract include the promises and affirmations of fact Defendant make on the Products' packaging and through marketing and advertising, including Defendant's promise that the Products are "All Natural," "natural," and/or "naturals," as described above.  This marketing and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contracts between Plaintiffs Ferrera and Cooke  and the Florida Class members, on the one hand, and Defendant, on the other.

182.   In addition or in the alternative to the formation of an express contract, Defendant made each of its above-described representations to induce Plaintiffs Ferrera and Cooke and the

Florida Class members to rely on such representations, and they each did so rely (and should be presumed to have relied) on Defendant's "All Natural," "natural," and/or "naturals" representations as a material factor in their decision(s) to purchase the Products.

183.    All conditions precedent to Defendant's liability under this contract have been performed by Plaintiffs Ferrera and Cook and the Florida Class members when they purchased the Products for their ordinary purposes.

184.    On July 15, 2013, Plaintiffs sent Defendant a letter notifying it of violation of the law of the State of Florida, including notifying Defendant of its breach of express warranty under Florida law.  Defendant did not correct the misrepresentations identified in the letter.

185.    At all times relevant to this action, Defendant has breached its express warranties about the Products because the Products are not "All Natural," "natural," and/or "naturals" because they contained GMOs and other artificial and synthetic ingredients, in violation of Florida Statutes section 672.313(1)(a).

186.    As a result of Defendant's breaches of its express warranties, Plaintiffs Ferrera and Cooke and the Florida Class members were damaged in the amount of the purchase price they paid for the Products, in an aggregate amount to be proven at trial.

187.    Therefore, Plaintiffs Ferrera and Cooke pray for relief as set forth below.

## COUNT VI

### (Breach of Express Warranty, Mo. Rev. Stat. § 400.2-313)
### (By Plaintiff Anne Steimle,
### On Behalf of Herself and the Missouri Classes)

188.    Plaintiff Anne Steimle re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

189.    Ms. Steimle brings this claim for breach of express warranty on behalf of herself

46

and on behalf of the Missouri Classes, pursuant to Missouri Revised Statutes section 400.2-313.

190.    Ms. Steimle and the Missouri Class members each formed a contract with Defendant at the time they purchased the Products.  The terms of that contract include the promises and affirmations of fact Defendant made on the Products' packaging and through marketing and advertising, including Defendant's promise that the Products are "All Natural," "natural," and/or "naturals," as described above.  The marketing and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contracts between Ms. Steimle and the Missouri Class members, on the one hand, and Defendant, on the other.

191.    In addition or in the alternative to the formation of an express contract, Defendant made each of its above-described representations to induce the Ms. Steimle and the Missouri Class members to rely on such representations, and they each did so rely (and should be presumed to have relied) on Defendant's "All Natural," "natural," and/or "naturals" representations as a material factor in their decision(s) to purchase the Products.

192.    At all times relevant to this action, Defendant has breached its express warranties about the Products because the Products are not "All Natural," "natural," and/or "naturals," since they contained GMOs and other artificial and synthetic ingredients, in violation of Missouri Revised Statutes section 400.2-313.

193.    All conditions precedent to bring this cause of action have been satisfied. By virtue of a pre-suit notice letter sent to Defendant on or about July 15, 2013, Defendant was notified of its nationwide conduct in violation of the law of the State of Florida  Defendant did not correct the misrepresentations identified in the letter. Because Defendant was put on notice of its troublesome transactions occurring nationwide, which necessarily includes all states within

the United States, including Missouri, Defendant was adequately put on notice of its troublesome transaction occurring within the State of Missouri.

194.     As a result of Defendant's breaches of its express warranties, Ms. Steimle and the Missouri Class members were damaged in the amount of the purchase price they paid for the Products, in an aggregate amount to be proven at trial.

195.     Therefore, Plaintiff Steimle prays for relief as set forth below.

## COUNT VII

**(Intentional Misrepresentation under Florida Law)**
**(By Plaintiffs Adele Ferrera and  Dana Cooke**
**On Behalf of Themselves and the Florida Classes)**

196.     Plaintiffs Adele Ferrera and Dana Cook re-allege and incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

197.     Ms. Ferrera and Ms. Cooke bring this claim on behalf of themselves and on behalf of the Florida Classes under Florida law.

198.     Defendant has intentionally misrepresented a material fact about the Products by advertising, marketing, distributing, and/or selling the Products to Plaintiffs Ferrera and Cooke and the Florida Class members with claims that they are "All Natural," "natural," and/or "naturals."

199.     At the time Defendant made the misrepresentations herein alleged, Defendant knew the products were not "All Natural," "natural," and/or "naturals" because they contained GMOs and other artificial and synthetic ingredients.

200.     Defendant misrepresented the Products as "All Natural," "natural," and/or "naturals" with the purpose of inducing Plaintiffs Ferrera and Cooke and the Florida Class members to rely on those misrepresentations and inducing Plaintiffs Ferrera and Cooke and the

48

Florida Class members to purchase the Products.

201.    Plaintiffs Ferrera and Cooke and the Florida Class members reasonably relied on Defendant's representations that the Products were "All Natural," "natural," and/or "naturals," and, in reasonable reliance thereon, purchased the Products.

202.    Plaintiffs Ferrera and Cookeand the Florida Class members were ignorant as to the falsity of Defendant's "All Natural," "natural," and/or "naturals" misrepresentations and would not have purchased the Products had they known the Products were not "All Natural," "natural," and/or "naturals" because they contained GMOs and other artificial and synthetic ingredients.

203.    Plaintiffs Ferrera and Cooke and the Florida Class members were injured in fact and lost money as a result of Defendant's conduct of improperly describing the Products as "All Natural," "natural," and/or "naturals."   Plaintiffs Ferrera and Cooke and the Florida Class members paid for Products that were "All Natural," "natural," and/or "naturals," but did not receive such Products.

204.    The Products Plaintiffs Ferrera and Cooke and the Florida Class members received were worth less than the Products for which they paid.

205.    Therefore, Plaintiffs Ferrera and Cooke pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of each of the Classes described in this Second Amended Complaint, respectfully request that:

A.    The Court certify the Classes pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2) and/or 23(b)(3) and adjudge Plaintiffs and their counsel to be adequate representatives thereof;

B.      The Court enter an Order declaring Defendant's conduct to be in violation of the applicable consumer protection statues, requiring Defendant to pay to Plaintiffs and other members of the Classes economic, monetary, consequential, compensatory, or statutory damages, whichever is greater; and, if Defendant's conduct is proved willful, awarding Plaintiffs and the other members of the Classes exemplary damages to the extent provided by law;

C.      The Court enter an Order awarding restitution and disgorgement of all monies Defendant acquired by means of any act or practice declared by this Court to be wrongful, or any other appropriate remedy in equity, to Plaintiffs and the other members of the Classes;

D.      The Court enter an Order awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendant from continuing the unlawful practices set forth above; directing Defendant to cease its deceptive and misleading marketing campaign in which it describes the Products as "All Natural," "natural," and/or "naturals"; and directing Defendant to disgorge all monies Defendant acquired by means of any act or practice declared by this Court to be wrongful;

E.      The Court enter an Order awarding Plaintiffs, individually and on behalf of the other members of the Classes, their expenses and costs of suit, including reasonable attorneys' fees and reimbursement of reasonable expenses, to the extent provided by law;

F.      The Court enter an Order awarding to Plaintiffs individually and on behalf of the other members of the Classes pre- and post-judgment interest, to the extent allowable; and

G.      For such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs and the Class members hereby demand a trial by jury.

Date: April 3, 2015                           Respectfully submitted,

                                              */s/ Joshua Eggnatz*
                                              Joshua H. Eggnatz
                                              Florida Bar No. 0067926
                                              Michael J. Pascucci
                                              Florida Bar No. 0083397
                                              **EGGNATZ, LOPATIN & PASCUCCI, LLP.**
                                              54000 S. University Drive, Suite 413
                                              Davie, Florida 33328
                                              954-889-3359
                                              Fax:  954-889-5913
                                              Email: *JEggnatz@ELPLawyers.com*

                                              Benjamin M. Lopatin (admitted *pro hac vice*)
                                              **EGGNATZ, LOPATIN & PASCUCCI, LLP.**
                                              580 California Street, Suite 1200
                                              San Francisco, CA 94104
                                              415-324-8620
                                              Email: *BLopatin@ELPLawyers.com*

                                              Michael R. Reese (admitted *pro hac vice*)
                                              George V. Granade (admitted *pro hac vice*)
                                              **REESE LLP**
                                              875 Avenue of the Americas
                                              18th Floor
                                              New York, NY 10001
                                              212-646-0500
                                              Email: *mreese@reeserichman.com*
                                                      *ggranade@reeserichman.com*

                                              Melissa W. Wolchansky (admitted *pro hac vice*)
                                              Dustin W. Massie (admitted *pro hac vice*)
                                              **HALUNEN LAW**
                                              1650 IDS Center
                                              80 South Eight Street
                                              Minneapolis, MN 55402
                                              612-605-4098
                                              Email: *wolchansky@halunenlaw.com*
                                                      *massie@halunenlaw.com*

51

Howard W. Rubinstein (Florida Bar No. 104108)
**THE LAW OFFICES OF**
**HOWARD W. RUBINSTEIN, P.A.**
3507 Kyoto Gardens Drive
Suite 200
Palm Beach Gardens, Florida  33401
Telephone:     (800) 436-6437
Facsimile:     (415) 692-6607
Email:         _howardr@pdq.net_

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 17, 2015, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send copies to all counsel of record set forth on the Service List below.

/s/ Joshua Eggnatz
Joshua H. Eggnatz

## SERVICE LIST

*Barron v. Snyder's-Lance, Inc.*
No. 0:13-cv-62496-JAL
United States District Court for the Southern District of Florida

Joshua H. Eggnatz
**EGGNATZ, LOPATIN & PASCUCCI, LLP.**
54000 S. University Drive, Suite 413
Davie, Florida 33328
954-889-3359
Fax: 954-889-5913
Email: *JEggnatz@ELPLawyers.com*

Benjamin M. Lopatin (admitted *pro hac vice*)
**EGGNATZ, LOPATIN & PASCUCCI, LLP.**
580 California Street, Suite 1200
San Francisco, CA 94104
415-324-8620
Email: *BLopatin@ELPLawyers.com*

Michael R. Reese (admitted *pro hac vice*)
George V. Granade (admitted *pro hac vice*)
**REESE LLP**
875 Avenue of the Americas
18th Floor
New York, NY 10001
212-646-0500
Email: *mreese@reeserichman.com*
        *ggranade@reeserichman.com*

53

Melissa W. Wolchansky (*pro hac vice*)
**HALUNEN LAW**
1650 IDS Center
80 South Eight Street
Minneapolis, MN 55402
612-605-4098
Email: *wolchansky@halunenlaw.com*


Howard Weil Rubinstein
**THE LAW OFFICES OF**
**HOWARD W. RUBINSTEIN, P.A.**
3507 Kyoto Gardens Drive - Suite 200
Palm Beach Gardens, FL 33401
832-715-2788
Fax: 4156926607
Email: *howardr@pdq.net*


Kiran H. Mehta
**TROUTMAN SANDERS LLP**
301 South College Street -Suite 3400
Charlotte, NC 28202
704-998-4072
Fax: 704-998-4051
Email: *kiran.mehta@troutmansanders.com*


Matthew G. Ball (admitted *pro hac vice*)
**K&L GATES, LLP**
4 Embarcadero Center
Suite 1200
San Francisco, CA 94111
415-249-1014
Email: *matthew.ball@klgates.com*


April Lynn Boyer
Jonathan Bart Morton
Olivia Rae Waters Kelman
**K&L GATES, LLP**
200 South Biscayne Boulevard -Suite 3900
Miami, FL 33131-2399
305-539-3357
Fax: 305-358-7095
Email: *april.boyer@klgates.com*
          *jonathan.morton@klgates.com*
          *olivia.kelman@klgates.com*

---

SECOND AMENDED CLASS ACTION COMPLAINT
CERTIFICATE OF SERVICE